**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

FILED
2018 MAY 10 AM 10: 32

FLORIDA COASTAL SCHOOL OF LAW, INC.;
and INFILAW CORPORATION,

        *Plaintiffs,*

        v.

AMERICAN BAR ASSOCIATION;
COUNCIL OF THE SECTION OF LEGAL
EDUCATION AND ADMISSIONS TO THE BAR,
AMERICAN BAR ASSOCIATION; and
ACCREDITATION COMMITTEE OF THE
SECTION OF LEGAL EDUCATION AND
ADMISSIONS TO THE BAR, AMERICAN BAR
ASSOCIATION,

        *Defendants.*

Case No.: 3:18-cv-621-J-32QPK

## COMPLAINT AND DEMAND FOR JURY TRIAL
## INJUNCTIVE RELIEF SOUGHT

      Plaintiffs, Florida Coastal School of Law, Inc., and InfiLaw Corporation, by and through

their attorneys at Kirkland & Ellis LLP and Alexander DeGance Barnett P.A., bring this civil

action against Defendants—American Bar Association; Council of the Section of Legal

Education and Admissions to the Bar, American Bar Association; and Accreditation Committee

of the Section of Legal Education and Admissions to the Bar, American Bar Association

(collectively, "ABA")—and allege as follows:

### NATURE OF THE ACTION

      1.    This is a civil action for declaratory and injunctive relief and damages to remedy

the ABA's violations of due process in the accreditation process. On April 27, 2018, the ABA

issued a decision regarding the accreditation of Florida Coastal School of Law and required the

law school immediately to notify existing and prospective students about the decision. As

explained in this Complaint, the ABA violated its obligation to provide due process to the law school.

## PARTIES

2.  Plaintiff Florida Coastal School of Law, Inc., operates a law school, the Florida Coastal School of Law ("Florida Coastal" or "the law school"), in Jacksonville, Florida.

3.  Plaintiff InfiLaw Corporation ("InfiLaw") owns Florida Coastal School of Law, Inc.

4.  Defendant American Bar Association is a corporate entity organized into various components, including the "Council" and the "Accreditation Committee," as described below.

5.  Defendant Council of the Section of Legal Education and Admissions to the Bar, American Bar Association ("Council") is a component of the American Bar Association. Pursuant to 34 C.F.R. Part 602, the U.S. Department of Education ("DOE") has recognized the Council as the agency for accrediting programs in legal education that lead to a professional degree in law and the law schools offering such programs.

6.  Defendant Accreditation Committee of the Section of Legal Education and Admissions to the Bar, American Bar Association ("Committee" or "Accreditation Committee") is a component of the American Bar Association. The DOE's recognition of the Council as an accrediting agency extends to the Committee for decisions involving continued accreditation of law schools.

7.  The American Bar Association, the Council, and the Committee are collectively referred to herein as the "ABA."

## JURISDICTION AND VENUE

8.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C.

§ 1332(a)(1) and 20 U.S.C. § 1099b(f).

9.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' civil action against Defendants arises under the Constitution, laws, or treaties of the United States and presents the question whether Defendants violated their federal obligation to provide due process in the accreditation process.

10.     This Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiffs and Defendants are citizens of different States. Florida Coastal is incorporated in Delaware and has its principal place of business in Florida. InfiLaw is incorporated in Delaware and has its principal place of business in Florida. The American Bar Association is incorporated in Illinois and has its principal place of business in Illinois. The Council and the Committee are components of the American Bar Association and are not separately incorporated. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

11.     This Court has jurisdiction under 20 U.S.C. § 1099b(f), which provides: "Notwithstanding any other provision of law, any civil action brought by an institution of higher education seeking accreditation from, or accredited by, an accrediting agency or association recognized by the Secretary [of Education] for the purpose of this subchapter and involving the denial, withdrawal, or termination of accreditation of the institution of higher education, shall be brought in an appropriate United States district court."

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). The Committee sent its decision of April 27, 2018 regarding Florida Coastal to the law school's address in Jacksonville and the law school received the decision in Jacksonville.

## FACTUAL ALLEGATIONS

### Florida Coastal School of Law

13.     Florida Coastal was founded in 1996. The Council fully accredited (or, in the ABA's terminology, fully "approved") the law school in 2002.

14.     As a law school, Florida Coastal is committed to the professional preparation of its students, service to underserved communities, and accountability of the faculty for student learning outcomes.

15.     The law school provides opportunities for persons who, because of background, status, or historical disadvantage, may have limited access to legal education. The law school strives to play a leading role in diversifying what remains America's least diverse profession.

16.     Florida Coastal has produced more than 5,000 graduates who have pursued successful legal careers in a wide variety of practice areas in 49 states and in countries around the world.

17.     In recent years, Florida Coastal has made changes to its admissions policy, academic program, academic support, and bar preparation efforts. As a result, the law school has seen improvements in objective metrics and outcomes.

18.     In Spring 2018, the entering credentials of Florida Coastal students were higher than or equal to 52 other ABA-approved law schools.

19.     In April 2018, the Florida Board of Bar Examiners announced that the first-time passage rate for Florida Coastal graduates who sat for the February 2018 Florida bar examination was 62.1%. This 62.1% pass rate of Florida Coastal graduates ranked fourth out of the eleven law schools in the state. The pass rate of Florida Coastal graduates on the February 2018 Florida bar exam also exceeded the pass rate of graduates of the Western Michigan University Thomas

4

M. Cooley Law School, an out-of-state law school that has a campus in Florida. Of the Florida Coastal students who graduated in December 2017 and took the February 2018 bar exam as first-time bar exam takers, 72% passed.

20.     In January 2018, it was announced that 97% of Florida Coastal students who took the National Multistate Professional Responsibility Examination ("MPRE") in November 2017 passed the MPRE. This 97% pass rate of Florida Coastal students ranked first out of the eleven law schools in the state. Passage of the MPRE is required for admission to the Florida bar.

21.     In 2018, Florida Coastal's National Moot Court Team finished first in Florida and 14th in the nation.

22.     The accolades and awards received by Florida Coastal include the following:

a)  In 2017, for the third year in a row, Florida Coastal was a recipient of The INSIGHT Into Diversity Higher Education Excellence in Diversity (HEED) Award, which recognizes colleges and universities demonstrating an outstanding commitment to diversity and inclusion;

b)  In 2017, for the third consecutive year, Florida Coastal was designated as "Military Friendly®" by veteran-owned VIQTORY for excelling at supporting and retaining military veterans as employees and students;

c)   In 2016, Florida Coastal was recognized by the Jacksonville Bar Association for sustained Commitment to Diversity and Inclusion in the Legal Profession for All;

d)  In 2016, Florida Coastal earned an A- ranking by *National Jurist* magazine for Best Practical Training and a B+ for Most Diverse Law Schools; and

e)  In 2016, Florida Coastal and its Lambda Law Student Association received

the JASMYN Gold Award for efforts to advance equality for LGBT people, and for the law school having LGBT inclusive policies and benefits for its employees.

### ABA Accreditation

23.    Pursuant to 34 C.F.R. Part 602, the U.S. Department of Education ("DOE") has recognized the Council as the agency for accrediting programs in legal education that lead to a professional degree in law and the law schools offering such programs.

24.    The DOE's recognition of the Council extends to the Accreditation Committee for decisions involving continued accreditation of law schools.

*ABA Standards 301(a), 309(a), 501(a) and 501(b)*

25.    The Council has promulgated Standards and Rules of Procedure for Approval of Law Schools ("Standards").

26.    Standard 301(a) provides: "A law school shall maintain a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession."

27.    Standard 309(b) provides: "A law school shall provide academic support designed to afford students a reasonable opportunity to complete the program of legal education, graduate, and become members of the legal profession."

28.    Standard 501(a) provides: "A law school shall adopt, publish, and adhere to sound admission policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education."

29.    Standard 501(b) provides: "A law school shall only admit applicants who appear capable of satisfactorily completing its program of legal education and being admitted to the bar."

30.    Interpretation 501-1 provides: "Among the factors to consider in assessing compliance with this Standard are the academic and admission test credentials of the law school's entering students, the academic attrition rate of the law school's students, the bar passage rate of its graduates, and the effectiveness of the law school's academic support program." Interpretation 501-1 also states: "Compliance with Standard 316 is not alone sufficient to comply with the Standard."

31.    The Committee in its April 27, 2018 decision found that Florida Coastal was not in compliance with Standards 301(a), 309(b), and 501(b) and Interpretation 501-1, and directed Florida Coastal to give public notice of the decision.

32.    Standards 301(a), 309(b), 501(a), and 501(b) and Interpretation 501-1 are vague and lack objective metrics for determining compliance or noncompliance.

33.    Maureen O'Rourke, the current Chair of the Council, at a Council meeting held in October 2016 (when she was Chair-elect), publicly admitted what many people involved in the ABA accreditation process have long known:  that the ABA views its own Standards as "fuzzy and hard to enforce."   Chair O'Rourke's admission is contrary to the provisions of the HEA and DOE regulations requiring an accrediting agency to have "*clear* standards" of accreditation.  20 U.S.C. § 1099b(a)(6); 34 C.F.R. § 602.18(a) (emphasis added).

*Other ABA Standards*

34.    Standard 202(a) provides:  "The current and anticipated financial resources available to the law school shall be sufficient for it to operate in compliance with the Standards and to carry out its program of legal education."

35.    Standard 316, captioned "Bar Passage," provides in pertinent part as follows:

Standard 316. BAR PASSAGE

7

(a) A law school's bar passage rate shall be sufficient, for purposes of Standard 301(a), if the school demonstrates that it meets any one of the following tests:

(1) That for students who graduated from the law school within the five most recently completed calendar years:

(i) 75 percent or more of these graduates who sat for the bar passed a bar examination; or

(ii) in at least three of these calendar years, 75 percent of the students graduating in those years and sitting for the bar have passed a bar examination.

\* \* \*

(2) That in three or more of the five most recently completed calendar years, the school's annual first-time bar passage rate in the jurisdictions reported by the school is no more than 15 points below the average first-time bar passage rates for graduates of ABA-approved law schools taking the bar examination in these same jurisdictions.

\* \* \*

(b) A school shall be out of compliance with this Standard if it is unable to demonstrate that it meets the requirements of paragraph (a)(1) or (2).

\* \* \*

36.    A law school complies with Standard 316 if it satisfies either of two metrics. Under paragraph (a)(1), compliance with Standard 316 is based on ultimate bar pass rates (*i.e.*, the percentage of a law school graduating class that passed a bar examination).  Under paragraph (a)(2), compliance with Standard 316 is based on first-time bar pass rates (*i.e.*, the percentage of a graduating class that passed the bar on the first attempt).

37.    In contrast to such Standards as 301(a), 309(b), 501(a), 501(b) and Interpretation 501-1, Standard 316 is a clear standard and sets forth objective metrics for assessing compliance.

8

38.     Florida Coastal is in compliance with Standard 316 based on the ultimate bar pass rate metric.  In a submission to the Committee on November 8, 2017, Florida Coastal provided the following ultimate pass rate data:

| Graduation Year | Ultimate Pass Rate |
|-----------------|--------------------|
| 2011            | 90.06%             |
| 2012            | 94.64%             |
| 2013            | 89.30%             |
| 2014            | 85.43%             |
| 2015            | 77.17%             |

In its submission, Florida Coastal noted that graduation year 2015 was the most recent year for which it had a full accounting of ultimate pass rates.

39.     Florida Coastal's compliance with Standard 316, the standard specifically governing bar pass, makes it arbitrary and capricious for the ABA to rely on bar pass data to conclude that the law school is out of compliance with the ABA's "fuzzy" standards that lack objective metrics for assessing compliance.

40.     Standard 507 provides:  "A law school shall demonstrate reasonable steps to minimize student loan defaults, including provision of debt counseling at the inception of a student's loan obligations and again before graduation."

**The ABA's Obligation Under Federal Law to Provide Due Process**

41.     Several sources of federal law require the ABA to provide due process to the law schools it accredits.

*The HEA and DOE Regulations*

42.     The Higher Education Act ("HEA") provides that an accrediting agency recognized by the U.S. Secretary of Education

> shall establish and apply review procedures throughout the accrediting process, including evaluation and withdrawal proceedings, which comply with due process procedures that provide -- (A) for adequate written specification of -- (i) requirements, including clear standards for an institution of higher education or program to be accredited; and (ii) identified deficiencies at the institution or program examined; (B) for sufficient opportunity for a written response, by an institution or program, regarding any deficiencies identified by the agency or association to be considered by the agency or association -- (i) within a timeframe determined by the agency or association; and (ii) prior to final action in the evaluation and withdrawal proceedings[.]

20 U.S.C. § 1099b(a)(6).

43.     The DOE has promulgated regulations governing due process in the accreditation process ("DOE regulations").  The DOE regulations provide that an accrediting agency "must demonstrate that the procedures it uses throughout the accrediting process satisfy due process." 34 C.F.R. § 602.25.

44.     34 C.F.R. § 602.25, captioned "Due process," provides that an accrediting agency must demonstrate that it:

> (a) Provides adequate written specification of its requirements, including clear standards, for an institution or program to be accredited or preaccredited.

> (b) Uses procedures that afford an institution or program a reasonable period of time to comply with the agency's requests for information and documents.

> (c) Provides written specification of any deficiencies identified at the institution or program examined.

> (d) Provides sufficient opportunity for a written response by an institution or program regarding any deficiencies identified by the agency, to be considered by the agency within a timeframe determined by the agency, and before any adverse action is taken.

(e) Notifies the institution or program in writing of any adverse accrediting action or an action to place the institution or program on probation or show cause. The notice describes the basis for the action.

(f) Provides an opportunity, upon written request of an institution or program, for the institution or program to appeal any adverse action prior to the action becoming final.

\* \* \*

(g) The agency notifies the institution or program in writing of the result of its appeal and the basis for that result.

34 C.F.R. § 602.25(a)-(g).

45.    Another DOE regulation, 34 C.F.R. § 602.18, captioned "Ensuring consistency in decision-making," provides that an accrediting agency "must consistently apply and enforce [its] standards." This regulation provides that an agency must have "written specification of the requirements for accreditation ... that include clear standards for an institution or program to be accredited." *Id.* § 602.18(a). The agency also must have "effective controls against the inconsistent application of the agency's standards." *Id.* § 602.18(b). And the agency must provide a law school with "a detailed written report that clearly identifies any deficiencies in the [school's] compliance with the agency's standards." *Id.* § 602.18(e).

*The Federal Common Law Duty to Provide Due Process*

46.    The HEA and DOE regulations are binding on the ABA. The HEA and DOE regulations also help to inform the ABA's duty under federal common law right to provide due process to the law schools it accredits.

47.    Accrediting agencies such as the Council and the Committee have an obligation under federal common law to provide due process to the law schools they accredit.

48.    In recognizing the federal common law duty of due process, courts have observed that accreditation agencies, "like all other bureaucratic entities, can run off the rails." *Prof'l*

*Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. & Colls.*, 781 F.3d 161, 169 (4th Cir. 2015). "[A]ccreditors wield enormous power over institutions—life and death power, some might say—which argues against allowing such agencies free rein to pursue personal agendas or go off on some ideological toot." *Id.* at 170.

49.     Principles of administrative law inform the federal common law duty of due process.

50.     An accreditor's decision violates administrative law principles if it is arbitrary, capricious, unreasonable, an abuse of discretion, not in accordance with law, contrary to constitutional right, without observance of procedure required by law, or not based on substantial evidence (collectively, "arbitrary and capricious").

51.     An accreditor violates administrative law principles if it fails to provide a reasoned explanation for its decisions.

52.     An accreditor's decisions must be consistent, and the accreditor must provide a reasoned explanation for any departure from past precedent. *See also* 34 C.F.R. § 602.18 (providing that an accrediting agency "must consistently apply and enforce [its] standards").

53.     Like an agency, an accreditor may not defend a decision on new grounds not set forth by the accreditor in its original decision.

*Fifth Amendment Due Process*

54.     The Fifth Amendment to the United States Constitution provides that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

55.     A private entity may be deemed a state actor, and therefore subject to the Due Process Clause of the Fifth Amendment, to the extent that the federal government has delegated

12

governmental functions to the entity, or coerced, pressured, or significantly encouraged the entity to take an action that would be unconstitutional if taken by the government.

56.     InfiLaw officers have information and believe that during the prior Administration one or more DOE officials coerced, pressured, or significantly encouraged the ABA to take adverse accreditation actions against for-profit law schools, including law schools owned by InfiLaw.

57.     In 2017, a now-former DOE official publicly touted on social media as one of his personal "achievements" leading the DOE to impose an "unprecedented restriction on a for-profit law school's" access to the Title IV student loan program.  That official was referring to the Charlotte School of Law, an InfiLaw-owned law school.

58.     InfiLaw officers have information and believe that some ABA officials are biased against InfiLaw-owned law schools because of their proprietary status.  DOE regulations require the ABA to control such bias.  Under the DOE regulations, an accrediting agency must have "effective controls against the inconsistent application of the agency's standards."  34 C.F.R. § 602.18(b),

59.     Historically, the ABA was opposed to and prohibited the accreditation of proprietary law schools.  In 1995, the U.S. Department of Justice filed a complaint against the ABA which alleged, among other things, that "[t]he ABA has required that an accredited law school must be organized as a non-profit educational institution."  Complaint ¶ 17, *United States v. American Bar Association*, No. 95-1211 (D.D.C. June 27, 1995).  The complaint also alleged that "[t]he ABA has never accredited a proprietary law school." *Id.*  In 1996, the U.S. District Court for the District of Columbia entered a final judgment prohibiting the ABA from "adopting or enforcing any Standard, Interpretation or Rule, or taking any action that has the purpose or

effect of prohibiting a law school from ... being an institution organized as a for-profit entity."

Final Judgment at 4, *United States v. American Bar Association*, No. 95-1211 (D.D.C. June 25, 1996).

### The Committee's April 27, 2018 Decision Violates Due Process

60.     On April 27, 2018, the Committee issued a decision concluding that Florida Coastal is not in compliance with Standard 301(a) concerning a rigorous program of education; Standard 309(b) concerning academic support; and Standard 501(b) and Interpretation 501-1 concerning admission of capable applicants.  The Committee also concluded that the "the issues of non-compliance with Standards 301(a), 309(b), and 501(b) and Interpretation 501-1 are substantial and have been persistent."  Conclusion (3).  The Committee directed the law school to take specific remedial actions, including notifying existing students and potential applicants of the decision.

61.     As explained below, the Committee's decision of April 27, 2018, regarding Florida Coastal violated due process.

### *Background to the April 27, 2018 Decision*

62.     On March 23, 2016, the Committee, following its consideration of (i) an interim monitoring review letter from the Committee's Managing Director on Florida Coastal's compliance with Standards 402 (regarding the number of full-time faculty), 501(b), and 508 (regarding career counseling and other student services), and (ii) information provided by Florida Coastal in response to that letter, informed the law school that the Committee had "determined to take no further action at this time with regard to the Law School's compliance with the Standards."

63.     Notwithstanding the Committee's stated determination to "take no further action" on Florida Coastal's compliance with the Standards, less than six weeks later, on May 2, 2016, the Committee sent a letter to Florida Coastal stating that it had reviewed data supplied in the law school's 2015 ABA Annual Questionnaire and requested information from Florida Coastal "so that the Committee can determine if the Law School continues to be in compliance with" Standards 202, 301, 309(b), and 501(b).

64.     In response to the Committee's request for information, Florida Coastal provided a submission to the Committee on or about December 7, 2016.  Florida Coastal's submission contained detailed information on its compliance with the Standards.

65.     On March 31, 2017, the Committee released a decision concluding that no further review was necessary at that time regarding Standard 202 but that the Committee was unable to determine whether Florida Coastal was in compliance with Standards 301(a), 309(b), 501(a), 501(b) and Interpretation 501-1.  The Committee requested additional information from Florida Coastal on those Standards.

66.     In response to the Committee's request for information, Florida Coastal provided a submission to the Committee on or about July 31, 2017.  Florida Coastal's submission contained detailed information on its compliance with the Standards.

67.     On September 28, 2017, the Committee released a decision concluding that Florida Coastal was not in compliance with Standards 301(a), 309(b), 501(a), 501(b) and Interpretation 501-1.  The Committee requested that Florida Coastal submit a report and additional information demonstrating its compliance with those Standards.

68.     In response to the Committee's request for a report and additional information, Florida Coastal provided a submission to the Committee on or about November 8, 2017. Florida Coastal's submission contained detailed information on its compliance with the Standards.

69.     On December 13, 2017, the Committee released a decision concluding that Florida Coastal was not in compliance with Standards 301(a), 309(b), 501(a), 501(b) and Interpretation 501-1. The Committee requested that Florida Coastal submit a response and additional information appear at a meeting of the Committee on March 15-17, 2018.

70.     In response to the Committee's request for a report and additional information, Florida Coastal provided a submission to the Committee on February 1, 2018. Florida Coastal's submission contained detailed information on its compliance with the Standards.

71.     Florida Coastal's leadership, including the President, Dean, and Dean of Academic Affairs of the law school, appeared at the Committee's meeting on March 17, 2018.

*The Committee's Decision of April 27, 2018 on Florida Coastal Fails to Provide a Reasoned Explanation for its Conclusions*

72.     On April 27, 2018, the Committee released to Florida Coastal its decision, which was styled as "Decision of the Accreditation Committee, March 2018."

73.     The Committee's April 27, 2018 decision reflects all of the worst (and due process violating) tendencies of ABA accreditation decisions in recent years: The decision finds the law school out of compliance with vague ABA Standards that lack objective metrics for determining compliance. The decision does not provide a reasoned explanation of how the law school is out of compliance with the Standards at issue. The decision reaches conclusions that are contrary to and not supported by the facts found in the decision. The decision fails adequately to explain any of its conclusions of noncompliance with the Standards and provides no explanation at all for some of its conclusions. The decision fails to provide any guidance on

16

what the law school must do or show to return to compliance with the Standards. The decision imposes specific remedial actions that are wholly unrelated to the Standards at issue and counterproductive to the law school's efforts to return to compliance with the Standards, including requirements to immediately notify both existing students and potential applicants of the Committee's decision. The decision is inconsistent with another ABA decision issued the same day concerning a not-for-profit law school and fails even to address the other decision let alone attempt to reconcile the two decisions.

74.     In its April 27, 2018 decision, the Committee concluded that Florida Coastal is in compliance with Standard 501(a) concerning sound admission policies and practices.

75.     The Committee also concluded, however, that Florida Coastal is not in compliance with Standard 301(a) concerning rigorous program of education; Standard 309(b) concerning academic support; and Standard 501(b) and Interpretation 501-1 concerning admission of capable applicants.

76.     In violation of basic principles of due process, the Committee in its decision did not explain or justify its conclusions of noncompliance with the Standards. Instead, the Committee indifferently stated "See Findings of Fact (5)-(15)." Conclusion (1). But the Committee failed to explain how the cited findings supported its conclusion that Florida Coastal is not in compliance with the Standards. That failure on the Committee's part constituted a due process violation.

77.     The Committee, in concluding that Florida Coastal is not in compliance with the Standards 301(a), 309(b), and 501(b) and Interpretation 501-1, repeated the wording of those Standards, although the Committee sometimes used tortuous verbiage. *See, e.g.*, Conclusion (1) ("the Committee concludes … that the Law School is not in compliance with … 501(b) … in

that the Law School has failed to demonstrate that it is not admitting applicants who do not appear capable of satisfactorily completing its program of legal education and being admitted to the bar"). But simply repeating the wording of a standard does not explain how the law school has supposedly violated the standard.

78.     Furthermore, Standards 301(a), 309(b), and 501(b) and Interpretation 501-1 are not clear standards of accreditation. On the contrary, those Standards are vague and lack objective metrics for assessing compliance. The Chair of the Council has admitted that the ABA Standards are "fuzzy and hard to enforce."

*The Committee's Factual Findings Undermine Its Conclusions*

79.     The fact that the Committee failed to provide a reasoned explanation for its conclusions is sufficient to show that the Committee violated due process. But the Committee's factual findings, far from supporting the Committee's conclusions, actually undermine those conclusions, rending those conclusions arbitrary and capricious.

80.     The Committee's factual findings related to four matters:  bar exam results, LSAT scores, academic support, and Fall 2017 attrition.

*Bar Exam Results*

81.     The Committee's findings concerning the bar examination results of Florida Coastal students undermine the Committee's conclusions of noncompliance with the Standards.

82.     The Committee stated that the Florida bar examination results for July 2017 "continues the negative trend in the Law School's bar exam passage outcomes." Finding (9). But the Committee ignored the results of the Florida bar exam for February 2018. The Florida Board of Bar Examiners publicly released those results on April 16, 2018—eleven days *before* the Committee released its decision. The Dean of Florida Coastal emailed the results to the

Committee the same day they came out. Nevertheless, the Committee ignored the information, despite acknowledging in its decision that it knew the bar exam results would be publicly released on April 16. *See* Finding (10) ("The Law School expects a bar pass rate on the February 2018 bar conservatively in the low 50s and more optimistically in the 60s; results will be available on April 16.").

83.     Florida Coastal students who sat for the Florida bar exam in February 2018 had a 62.1% first-time pass rate (*i.e.*, the pass rate for persons taking the bar exam for the first time). That pass rate was 4.2 percentage points above the state average of 57.9%. The pass rate for Florida Coastal students ranked fourth in the state out of eleven schools. The 62.1% pass rate for Florida Coastal students was higher than for students at such schools as the University of Miami School of Law (56%), Stetson University College of Law (56%), and the University of Florida College of Law (31.8%). Florida Coastal supplied all of this public information to the Committee on April 16, yet the Committee made no mention of it in its April 27 decision.

84.     The improved bar results for Florida Coastal graduates are attributable to changes made by the law school and can be expected to continue. As the Committee acknowledged, the changes at the law school include "recent changes to the admissions policy of the Law School and its academic support programs," Finding (8), "changes in the mandatory bar preparatory courses," Finding (9), "a spring 2018 class with increased incoming credentials of a 150 median LSAT score," Finding (13), and "the determination to raise the entering credentials," Finding (16).

85.     Because the Committee improperly ignored the February 2018 bar exam results, the Committee was wrong to say that Florida Coastal's changes "have not been in place for a sufficient time to provide evidence that they have been or will be effective in improving the Law

School's outcomes." Finding (8). The February 2018 results are evidence that that the changes made by Florida Coastal have improved and will improve bar pass and other outcomes.

86. Florida Coastal complies with Standard 316, the bar pass standard, as the Committee acknowledged. The Committee noted that "the Law School satisfied Standard 316 for each of the years from 2012 to 2015 based on the Law School's first-time pass rate." Finding (9).

*LSAT Scores*

87. The Committee's findings concerning the LSAT scores of Florida Coastal students undermine the Committee's conclusion of noncompliance with the Standards.

88. The Committee found that "[t]he 25th percentile score of 145 [for 2017] is an improvement over 141 for 2016. At the Hearing, the Dean indicated that no score was lower than 143 for fall 2017. The Law School offered admission to 46 percent of all applicants and 66 students matriculated." Finding (4).

89. The Committee found that "the Law School has matriculated a spring 2018 class with increased credentials of a 150 median LSAT score." Finding (13).

90. The Committee found that "[t]he 25th percentile score of 147 for spring 2018 is an improvement over 145 for fall 2017 and 141 for 2016. At the Hearing, the Dean indicated that no new students had a score below 145. ... For the spring 2018 class, the Law School offered admission to 30 percent of all applicants." Finding (16).

91. The Committee concluded that Florida Coastal is in compliance with Standard 501(a), which requires a law school to follow "sound admissions policies and practices consistent with the Standards, its mission, and the objectives of its program of legal education." Standard 501(a); *see* Conclusion (2). The Committee cited "Findings of Fact (4) and (16)" in

support of Conclusion (2).  Florida Coastal agrees with the Committee's Conclusion (2), even though the Committee did not explain its reasoning.

### Academic Support

92.     The Committee's findings concerning academic support at Florida Coastal undermine for the Committee's conclusions of noncompliance with the Standards.  Findings of Fact (5)-(8) concern Florida Coastal's academic support in Fall 2017.  Those findings were drawn from Florida Coastal's own written submissions to the Committee and were complimentary of the law school's academic support.

### Fall 2017 Attrition

93.     The Committee's findings concerning Fall 2017 attrition results at Florida Coastal provide no basis or support for the Committee's conclusions of noncompliance with the Standards.  *See* Findings (11)-(15).  Of the 66 students who matriculated in Fall 2017, 20 were academically dismissed because they fell below the 2.0 law school grade point average required to remain in good standing, which is a 30% attrition rate.  Of those 20 students, at least five either ceased attending on their own or had personal issues that directly resulted in their being counted as academically dismissed.  *See* Finding (11).

94.     The Committee noted the numerous efforts being made by Florida Coastal to reduce attrition:  "[S]tudents are being monitored more closely and provided additional help with their writing.  Those on probation (2.0 to 2.29 GPA) must meet with their academic program director, consult materials on the D2L (Desire to Learn) platform, and create a study plan. ... Students on probation or alert cannot participate in certain activities like moot court or various organizations."  Finding (12).

95.     The Committee noted that: "The Law School used formative assessments for fall 2017 1Ls in an attempt to identify students struggling academically.  Formative assessments are given in every class and each faculty member must require a midterm worth at least 20 percent of the grade.  The 1Ls also had a midterm review.  Students struggling are identified for the Academic Programs Directors."  Finding (15).

96.     The Committee noted that "the Law School has matriculated a spring 2018 class with increased incoming credentials of a 150 median LSAT score."  Finding (13).

97.     The Committee did not explain how Fall 2017 attrition results contributed to or supported its conclusions of noncompliance despite the law school's numerous efforts to reduce attrition described in Findings (12), (13) and (15).

98.     In the period from 2012 to 2017, there were ten law schools that had attrition rates comparable to Florida Coastal's attrition rate in that period.  All ten of those law schools were at or above 20% academic attrition for each of those six years.  Nevertheless, only half of those schools, like Florida Coastal, have been cited by the ABA under Standard 501.

### The Committee's Conclusions and Specific Remedial Actions Imposed

99.     The Committee concluded that "the Law School's efforts and programmatic changes made have not sufficiently improved its outcomes."  Conclusion (1).  But the Committee did not provide a factual basis to explain how the improved outcomes were "not sufficient."  Nor did the Committee clarify what improvements to the outcomes would be considered "sufficient."

100.    The Committee also concluded that "[t]he Law School's plans for bringing itself into compliance with the Standards have not been demonstrated to be effective or reliable."  Conclusion (3).  But Conclusion (3), as well as Conclusion (1), ignore the February 2018 Florida bar results.

101.    The Committee's Conclusions (1) and (3) are also at odds with Finding (8), which states that "the recent changes to the admissions policy of the Law School and its academic support programs have not been in place for a sufficient period of time to provide evidence that they have been or will be effective in improving the Law School's outcomes." The Committee, however, provided no guidance on whether Florida Coastal's recently adopted changes simply need more time to demonstrate improved outcomes (as the February 2018 Florida bar results, ignored by the Committee, would suggest) or whether the law school should develop and implement a new and different plan for improving its outcomes.

*The Committee Did Not Explain Its Substantial and Persistent Conclusion*

102.    Under ABA Rule 16(a)(1), the ABA may impose sanctions on a law school for "[s]ubstantial or persistent noncompliance with one or more of the Standards." The Committee concluded that, pursuant to Rule 16(a), that "the issues of non-compliance with Standards 301(a), 309(b), and 501(b) and Interpretation 501-1 are substantial and have been persistent." Conclusion (3). But the Committee did not provide a factual basis to explain how those issues are "substantial' and have been "persistent" or set out criteria for substantiality or persistence. Moreover, Rule 16(a) requires that *noncompliance* with the Standards, not "issues of non-compliance," Conclusion (3), as the Committee concluded here, must be substantial or persistent. The Committee's conclusion did not match its rule.

*The Committee Compels Florida Coastal to Publicly Communicate the Committee's Determination*

103.    As a specific remedial action, the Committee required Florida Coastal, within five business days of April 27, 2018, to publish on its website and provide to all admitted students a public notice, in the form provided by the ABA, stating that the ABA has found the law school

not to be in compliance with Standards 301(a), 309(b), and 501(b) and Interpretation 501-1 ("the Public Notice"). Conclusion (4-d). A copy of the Public Notice is attached hereto as Exhibit 1.

104.    The Public Notice required by the Committee is a compelled speech requirement. The Public Notice forces Florida Coastal to communicate the ABA's flawed determination and views to the law school's students, prospective students, alumni, faculty, the legal community, and the public. Furthermore, the ABA's message that Florida Coastal is being forced to communicate is misleading because it is the product of the ABA's due process violations. The Public Notice inflicts immediate and irreparable injury on Florida Coastal and implicates the same concerns as those underlying the First Amendment's general prohibition against governmental efforts to compel speech from private parties.

105.    The Public Notice will harm Florida Coastal's ability to attract and retain higher credentialed students and to demonstrate compliance with the ABA standards and will cause other substantial damage to the law school, including by making it more difficult to attract and retain students. The Public Notice requirement inflicts on the law school irreparable injury.

106.    The Committee's decision directed Florida Coastal to publish the Public Notice within five business days (from April 27, 2018), and the law school timely complied with that directive.

107.    Florida Coastal has noticed its appeal of the Committee's decision to the Council, but the appeal does not stay the Public Notice requirements or any other aspect of the decision.

*The Committee Directs Florida Coastal to Communicate to its Students Misleading Information on Bar Pass Rates by Class Quartiles*

108.    The Committee directed Florida Coastal to communicate to all of its current students, "each semester, within 30 days of the completion of the assignment and distribution of semester grades," the following information: "(a) the Florida and Georgia first-time bar

24

examination passage rates, by class quartiles, for Law School graduates sitting for the Florida and Georgia bar examinations over the six administrations preceding the semester; [and] (b) the class quartile in which the student then falls." Conclusion (4-e). This directive is referred to herein as the "Bar Pass by Quartile Communication."

109.    The Bar Pass by Quartile Communication requires Florida Coastal to provide incomplete and misleading information to its students. For example, Florida Coastal would be required to tell students that they are in, for example, the 4th quartile and what the 4th quartile pass rates were for the last three years. The natural inference the ABA wants 4th quartile students to draw from this information is that their pass rate would be similar to that of the 4th quartile students in the past. But that desired inference is misleading and ignores critical information. Florida Coastal's current students do not have the same entering qualifications as those of students who took the last six bar examinations. For example, the 3rd quartile LSAT for the prior four bar exams (before February 2018) had an average LSAT of 144.4. The same 4th quartile had a 142.0 average LSAT. Florida Coastal currently does not accept students with an LSAT below 145. That means that the law school's current third and fourth class quartiles do not align with the class quartiles for the prior six bar exams. Thus, the Bar Pass by Quartile Communication requires Florida Coastal to give students information that is inaccurate as to their expected pass rates. In all events, the Bar Pass by Quartile Communication forces Florida Coastal to communicate a misleading message to its students it would not communicate (and could not be directed to communicate) in the absence of the Committee's flawed determinations that fail to comport with due process.

110.    Similarly, first year, first semester students would infer from their class quartile that they would perform similarly on the bar examination as those in the same class quartile did

on the previous six examinations. Graduating LGPA is a strong predictor of bar passage, but graduating LGPA and associated rank are not the same thing as cumulative rank and LGPA at earlier periods in a student's law school career. Furthermore, the strength of LGPA as a predictor for bar pass goes down each semester earlier in a student's law school career—with the LGPA of a first year, first semester student having the least predictive power. Providing students before their final semester this information (bar pass by graduating LGPA class quartiles and their current class quartile in the same email) has a high risk of giving them a projection of their bar pass for which there is not a sound basis in the statistics.

111.    Like the Public Notice, the Bar Pass by Quartile Communication is a compelled speech requirement. The Bar Pass by Quartile Communication forces Florida Coastal to communicate misleading information to its students. Like the Public Notice, the Bar Pass by Quartile Communication implicates the same concerns as those underlying the First Amendment's general prohibition against governmental efforts to compel speech from private parties. It also flows directly from the Committee's flawed accreditation determination.

112.    The Bar Pass by Quartile Communication will harm Florida Coastal's ability to attract and retain higher credentialed students and to demonstrate compliance with the ABA Standards and will cause other substantial damage to the law school. The Bar Pass by Quartile Communication inflicts further irreparable injury on the law school.

113.    Florida Coastal's appeal to the Council does not stay the Bar Pass by Quartile Communication requirement.

*The Committee Directs a Fact Finder to Investigate Irrelevant Financial Matters*

114.    The Committee ordered its Managing Director to appoint a fact finder to visit Florida Coastal to review and report to the Committee on "the admissions data and admissions

methodology provided by the Law School, as well as the overall rigor of its program of legal education." Conclusion (4-b).

115. The Committee also ordered the fact finder to review and report on irrelevant matters: "[t]he rate of default on loans taken by the Law School's graduates to finance their program of legal education and the employment status of the graduates of the Law School," Conclusion (4-b-v), and "[t]he finances of the Law School, particularly as they relate to the stated tuition and fees for 2016-17, the current and succeeding years, the amount of tuition discount, and the range of net tuition paid by class quartile," Conclusion (4-b-vi).

116. The stated purpose of the fact finder's report is to assist the Committee's evaluation of "the Law School's compliance with Standards 301(a), 309(b), and 501(b) and Interpretation 501-1." Conclusion (5). The financial matters described in Conclusions (4-b-v) and (4-b-vi), however, are irrelevant to the Committee's evaluation of those Standards. In the Committee proceedings culminating in the April 27, 2018 decision, Standard 202, which concerns a law school's financial resources, and Standard 507, which concerns student loan defaults, were not at issue. The Committee in its April 27, 2018 decision did not make any findings on Standard 202 or Standard 507. The Committee has not found that Florida Coastal is out of compliance with Standard 202 or Standard 507. Accordingly, it was arbitrary and capricious for the Committee to direct a fact finder to investigate the matters stated in Conclusions (4-b-v) and (4-b-vi).

*The ABA States That It May Withdraw the Law School's Accreditation by September 2019*

117. The Committee's April 27, 2018 decision included a "Notice" stating that the Committee and the Council will take "immediate adverse action" against Florida Coastal if the law school does not demonstrate compliance with the Standards by the end of the two-year

period that began on September 28, 2017. The Notice stated that "[f]or these purposes, adverse action means removal from the list of law schools approved by the American Bar Association." The Notice also stated that "the Accreditation Committee or the Council may take adverse action prior to the end of the two-year period."

*The Committee's Inconsistent Same-Day Decision on Cooley Law School*

118.    At its meeting on March 15-17, 2018, the Accreditation Committee considered the status of several law schools, including Florida Coastal and the Western Michigan University Thomas M. Cooley Law School ("Cooley"). On April 27, 2018, the same day the Committee released its decision on Florida Coastal, the Committee publicly released a decision concluding that Cooley is in compliance with Standard 501(b) and Interpretation 501-1. The Committee's decision on Cooley cited the "concrete steps taken by the Law School with respect to its admissions policy and practices."

119.    The Committee's Cooley decision is inconsistent with its decision the same day on Florida Coastal. Like Cooley, Florida Coastal has taken "concrete steps" with respect to its admissions policy and practices. A comparison of the two law schools' objective metrics renders the Committee's decision on Florida Coastal arbitrary and capricious.

120.    The Committee did not attempt to reconcile its decisions on Florida Coastal and Cooley. The Committee in its decision on Florida Coastal did not provide any explanation for its conclusion that Cooley is in compliance with the Standards but Florida Coastal is not.

121.    One difference between Florida Coastal and Cooley is that the former is a for-profit entity and the latter is not. But Florida Coastal's for-profit status is not a lawful basis for the ABA to take adverse action against the law school. Indeed, the Justice Department previously obtained an injunction prohibiting the ABA from engaging in such discriminatory treatment.

122.    The Committee in its April 27, 2018 decision did not cite as precedent any ABA decisions on any other law schools.

*Violation of 30-Day Rule*

123.    The Committee made its decision no later than March 17, 2018. The cover letter transmitting the decision to Florida Coastal and signed by Barry Currier, Managing Director of Accreditation and Legal Education, states: "Attached please find the decision of the Accreditation Committee *at its meeting on March 15-17, 2018*, with respect to Florida Coastal School of Law." Cover Letter (emphasis added.) The Committee violated 34 C.F.R. § 602.26(b), which provides that an accreditation agency must notify a school of an adverse decision "no later than 30 days after it reaches the decision." In violation of that DOE regulation, the Committee took 41 days, from May 17 to April 27, to notify Florida Coastal of its decision.

## CAUSES OF ACTION

### COUNT I
### (VIOLATION OF DUE PROCESS)

124.    Plaintiffs repeat and reallege the allegations of paragraphs 1-123 as if set forth fully herein.

125.    The ABA in its April 27, 2018 decision committed multiple violations of its obligation to provide due process to Florida Coastal.

126.    Contrary to the HEA and DOE regulations, as well as the federal common law due process obligation that is informed in part by those sources of law, the ABA violated due process in the following respects, among others: The ABA did not apply to Florida Coastal clear standards for accreditation; did not specify in writing the supposed deficiencies at Florida Coastal; did not consider Florida Coastal's responses regarding the supposed deficiencies,

including the most recent bar passage rates, before taking adverse action; did not describe the basis for its adverse accrediting actions; did not consistently apply and enforce it standards; and did not employ effective controls against the inconsistent application of its standards.

127.    In concluding that Florida Coastal is not in compliance with Standards 301(a), 309(b) and 501(b) and Interpretation 501-1 the ABA violated the due process required by federal common law.  The ABA's conclusions, adverse findings, and specific remedial actions imposed on Florida Coastal were arbitrary, capricious, unreasonable, an abuse of discretion, not in accordance with law, contrary to constitutional right, without observance of procedure required by law, and not based on substantial evidence.  The ABA failed to account for the most recent relevant information and failed to  provide a reasoned explanation for its decision, conclusions, adverse findings, and specific remedial actions imposed on Florida Coastal.  The ABA's decision on Florida Coastal was inconsistent with the ABA's same-day decision on another law school.

128.    The Standards formulated by the ABA and applied to Florida Coastal are vague and lack objective metrics for assessing compliance.

129.    Contrary to the HEA and DOE regulations, the ABA did not apply to Florida Coastal clear standards for accreditation; did not adequately specify in writing the supposed deficiencies identified at Florida Coastal; and did not describe the basis for its adverse accrediting actions and probation action.

130.    To the extent that one or more DOE officials during the prior Administration coerced, pressured, or significantly encouraged the ABA to take adverse accreditation action against for-profit law schools, including law schools owned by InfiLaw such as Florida Coastal, the ABA's actions violated the Due Process Clause of the Fifth Amendment.

## COUNT II
## (DECLARATORY JUDGMENT)

131.     Plaintiffs repeat and reallege the allegations of the paragraphs 1-123 as if set forth fully herein.

132.     The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

133.     Absent a declaratory judgment, there is a substantial likelihood that Florida Coastal will suffer irreparable injury in the future.

134.     There is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

135.     This Court possesses an independent basis for jurisdiction over the parties.

136.     A judgment declaring that the ABA's April 27, 2018 decision regarding Florida Coastal violated due process will serve a useful purpose in clarifying and settling the legal relations in issue and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)     Vacate, hold unlawful, and set aside the ABA's April 27, 2018 decision on Florida Coastal and the ABA's conclusions, adverse findings, and specific remedial actions in that decision, including but not limited to the Public Notice and Bar Pass by Quartile Communication;

(b)     Declare that the ABA's April 27, 2018 decision on Florida Coastal is arbitrary

31

and capricious and otherwise violated due process;

      (c)    Declare that, contrary to due process and the provisions of the HEA and DOE regulations requiring the ABA to articulate and apply "clear" accreditation standards, ABA Standards 301(a), 309(b), 501(b) and Interpretation 501-1 are unlawfully vague and, therefore, unenforceable;

      (d)    Grant an injunction prohibiting the ABA from applying or enforcing its April 27, 2108 decision against Florida Coastal, including but not limited to the Public Notice and the Bar Pass by Quartile Communication;

      (e)    Grant an injunction barring the ABA from enforcing Standards 301(a), 309(b), 501(b) and Interpretation 501-1 against Florida Coastal or any law school;

      (f)    Grant an injunction requiring the ABA to adhere to all of the requirements of due process in all future accreditation proceedings;

      (g)    Enjoin the ABA *pendente lite* from removing Florida Coastal from the list of ABA-approved law schools or otherwise withdrawing or terminating Florida Coastal's accreditation.

      (h)    Award damages for the ABA's violations of due process and its Public Notice and Bar Pass by Quartile Communication; and

      (i)    Award pre- and post-judgment interest, attorney's fees, and such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand trial by jury on all issues so triable.

32

Respectfully submitted,

Mark G. Alexander
Florida Bar No. 434078
ALEXANDER DEGANCE BARNETT P.A.
1500 Riverside Avenue
Jacksonville, Florida 32204
(904) 345-3277
mark.alexander@adblegal.com

Paul D. Clement*
Viet D. Dinh*
H. Christopher Bartolomucci*
KIRKLAND & ELLIS LLP
655 15th Street, NW
Washington, DC 20005
(202) 879-5000
paul.clement@kirkland.com
viet.dinh@kirkland.com
cbartolomucci@kirkland.com

*Motion for admission *pro hac vice* to be filed

*Counsel for Plaintiffs Florida Coastal School of Law, Inc., and InfiLaw Corporation*

Dated:  May 10, 2018