FLORIDA COASTAL SCHOOL OF LAW, INC.,
and INFILAW CORPORATION,

        *Plaintiffs*,

vs.

        Case No. 3:18-cv-621-BJD-39JBT

AMERICAN BAR ASSOCIATION; COUNCIL
OF THE SECTION OF LEGAL EDUCATION
AND ADMISSIONS TO THE BAR, AMERICAN
BAR ASSOCIATION; and ACCREDITATION
COMMITTEE OF THE SECTION OF LEGAL
EDUCATION AND ADMISSIONS TO THE
BAR, AMERICAN BAR ASSOCIATION,

        *Defendants*.

_____/

# PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
# AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... ii

REQUEST FOR TEMPORARY RESTRAINING ORDER ......................................... 1

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 4

    A.   Florida Coastal School of Law.................................................................. 4

    B.   The ABA and its Accreditation Standards .............................................. 5

    C.   The ABA's Duty Under Federal Law to Provide Due Process ................ 6

    D.   The ABA's Decision of April 27, 2018 Concludes That Coastal Is Not in Compliance With the Standards and Imposes Specific Remedial Actions..... 8

TRO AND PRELIMINARY INJUNCTION STANDARDS ..................................... 10

ARGUMENT ........................................................................................................... 11

    I.   The Law School Has a Substantial Likelihood of Success on its Federal Common Law Due Process Claim........................................................................... 11

    A.   The ABA's Conclusion That Coastal Is Not in Compliance With the Standards Is Arbitrary and Capricious........................................................ 12

    B.   The ABA's Findings Do Not Show Coastal to Be Out of Compliance With the Standards. ................................................................................... 14

    C.   The ABA's "Substantial and Persistent" Conclusion Is Wholly Unexplained. ............ 17

    D.   The ABA's Decision on Coastal Is Inconsistent With Its Contemporaneous Decision on Another Law School, and the ABA Did Not Even Attempt to Explain the Inconsistency.......................................................................... 18

    II.   The ABA's Decision Inflicts Irreparable Injuries on the Law School............................. 19

    A.   The Public Notice Harms Coastal's Ability to Attract and Retain Students by Forcing Coastal to Publicize the ABA's Due Process-Violating Decision.................. 20

    B.   The Bar Pass by Quartile Communication Requires Coastal to Provide Misleading Information to its Students. ........................................................................ 21

    C.   Violating Its Own Rules, the ABA Directed the Fact Finder to Investigate Financial Matters That Are Not Relevant to the ABA Standards At Issue................... 23

    III.   The Law School Will Suffer Irreparable Injuries While the ABA Will Not Be Harmed by a TRO and Preliminary Injunction.................................................................. 24

    IV.   A TRO and Preliminary Injunction Would Be in the Public Interest. .............................. 25

CONCLUSION AND REQUESTED RELIEF ........................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Am. Wild Horse Pres. Campaign v. Perdue,*
  873 F.3d 914 (D.C. Cir. 2017) ................................................................................. 7, 12

*BellSouth Advert. & Publ'g Corp. v. Real Color Pages, Inc.,*
  792 F. Supp. 775 (M.D. Fla. 1991) ....................................................................... 10, 24

*Bristol Univ. v. Accrediting Council for Indep. Colls. & Schs.,*
  691 F. App'x 737 (4th Cir. 2017) .................................................................................. 7

*Chi. Sch. of Automatic Transmissions, Inc. v. Accreditation All. of Career Schs. & Colls.,*
  44 F.3d 447 (7th Cir. 1994) ........................................................................................... 7

*Edward Waters Coll., Inc. v. S. Ass'n of Colls. & Schs., Inc.,*
  No. 3:05-cv-180, 2005 WL 6218035 (M.D. Fla. Mar. 11, 2005) ............................... 6, 7, 11, 24

*Elrod v. Burns,*
  427 U.S. 347 (1976) ..................................................................................................... 21

*Fine Mortuary Coll., LLC v. Am. Bd. of Funeral Serv. Ed., Inc.,*
  473 F. Supp. 2d 153 (D. Mass. 2006) ........................................................................... 7

*Fla. Coll. of Bus. v. Accrediting Council for Indep. Colls. & Schs.,*
  954 F. Supp. 256 (S.D. Fla. 1996) ....................................................................... passim

*Hiwassee Coll., Inc. v. S. Ass'n of Colls. & Schs.,*
  531 F.3d 1333 (11th Cir. 2008) .................................................................................... 7

*Judulang v. Holder,*
  565 U.S. 42 (2011) .................................................................................................. 7, 12

*Klay v. United Healthgroup, Inc.,*
  376 F.3d 1092 (11th Cir. 2004) ............................................................................. 11, 24

*Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Tech. Schs.,*
  817 F.2d 1310 (8th Cir. 1987) .................................................................................... 18

*Parker v. State Bd. of Pardons & Paroles,*
  275 F.3d 1032 (11th Cir. 2001) ......................................................................... 10, 24, 25

*Prof'l Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. & Colls.,*
  781 F.3d 161 (4th Cir. 2015) ..................................................................................... 7, 8

*Ramaprakash v. FAA,*
  346 F.3d 1121 (D.C. Cir. 2003) .................................................................................... 8

*S.D. v. St. Johns Cty. Sch. Dist.,*
  632 F. Supp. 2d 1085 (M.D. Fla. 2009) ...................................................................... 21

*Scott v. Roberts,*
  612 F.3d 1279 (11th Cir. 2010) .................................................................................. 20

*W. State Univ. of S. Cal. v. Am. Bar Ass'n,*
    301 F. Supp. 2d 1129 (C.D. Cal. 2004) ................................................................... 25

**Statute**

20 U.S.C. § 1099b.......................................................................................... 6, 12, 14

**Rule and Regulations**

Local Rule 4.05(b)(4) ................................................................................................ 11

34 C.F.R. § 602.18 ............................................................................................ 6, 17, 18, 19

34 C.F.R. § 602.25 ............................................................................................ 6, 7, 12, 14

34 C.F.R. §§ 668.71-668.74 .................................................................................. 22

**Other Authority**

Order, *Edward Waters*, No. 3:05-cv-00180 (M.D. Fla. Feb. 28, 2005), Dkt. 10 .......................... 11

## REQUEST FOR TEMPORARY RESTRAINING ORDER

Because the challenged decision requires the Plaintiff law school to communicate

misleading and harmful information to its students on **July 2, 2018**, the law school respectfully

requests a TRO postponing that communication requirement until 30 days after this Court rules

on the law school's preliminary injunction motion. A proposed TRO is submitted herewith. The

TRO is necessary to preserve the status quo pending this Court's consideration of the motion.

## INTRODUCTION

Florida Coastal School of Law ("Coastal" or "the law school") challenges an adverse

decision of its accreditor, the American Bar Association ("ABA"). In its decision of April 27,

2018, *see* Ex. 2,[1] the ABA concluded that Coastal is not in compliance with some of its

accreditation standards. That decision, however, was made in violation of the ABA's obligation

under federal law to provide due process to Coastal. That federal obligation requires the ABA to

make decisions that are reasoned and consistent with precedent, not arbitrary and capricious.

The ABA's due process violation in this case is stark. Not only did the ABA's stated

conclusions not follow from the facts that it found, but the ABA ignored perhaps the most

important data submitted by Coastal: its students' most recent bar exam results. In applying its

standards, the ABA gives considerable weight to the bar exam pass rate of a law school's

graduates. Coastal informed the ABA that on the February 2018 Florida bar examination,

Coastal students finished fourth out of the eleven law schools in Florida with a 62.1% first-time

passage rate—a pass rate above the state average and above fully-accredited law schools, such as

the University of Florida (31.8%), the University of Miami (56%), and Stetson University (56%).

The ABA ignored this significant data, however, and based its conclusions on older data, even

---

[1] All Exhibits cited herein are to the Declaration of Scott DeVito, the Dean of Coastal.

though Coastal submitted the February bar results to the ABA well before its decision.

The ABA's decision on Coastal is also blatantly inconsistent with the ABA's decision on the Thomas M. Cooley Law School ("Cooley"). In the Cooley decision, which came just nine days before the Coastal decision, the ABA concluded that Cooley was in compliance with the ABA's accreditation standards (after having previously been deemed out of compliance) because Cooley had raised its admissions standards three months earlier. The ABA stated that Cooley had taken "concrete steps" with respect to its admissions policy. Coastal, too, raised its admissions standards; it did so in the Fall of 2016, *see* DeVito Decl. ¶ 4, well before Cooley. Yet the ABA dismissed Coastal's changes as having "not been in place for a sufficient time" and as having "not sufficiently improved [Coastal's] outcomes." Finding (8) & Conclusion (1).[2] The ABA's decisions on Coastal and Cooley, made just nine days apart, are flatly inconsistent: Coastal's changes to its admissions policy clearly would satisfy the "concrete steps" test applied by the ABA in Cooley's case. And Cooley's changes clearly would not satisfy the sufficient-time-and-improvements test applied by the ABA in Coastal's case. Yet Cooley is now in compliance with the ABA's standards and Coastal is not. The ABA has not given a reasoned explanation, or any explanation, for the disparity in the treatment of the two law schools.

The need for immediate injunctive relief is imperative because the ABA's decision is not only unlawful, but it also inflicts irreparable injury on Coastal. It does so in three ways.

*First*, the ABA's decision compels Coastal to speak against itself by publishing on its website and providing to all admitted students a "Public Notice of Specific Remedial Action" scripted by the ABA announcing that Coastal is not in compliance with the ABA's accreditation standards. The damaging effect of the Public Notice can hardly be overstated. It will frustrate

---

[2] All Findings and Conclusions cited herein are to the ABA's April 27, 2018 decision. *See* Ex. 2.

the very progress Coastal has made, as reflected in its improving test scores, and will create a counterproductive cycle by causing better credentialed law school applicants not to apply to or not matriculate at Coastal—thereby making it more difficult for the law school to obtain results (such bar exam pass rates) necessary to be found in compliance with the ABA's standards.

*Second*, the ABA's decision requires Coastal to provide misleading information to its students about their likelihood of passing the bar examination. Specifically, the ABA directed Coastal to advise all students, every semester, of the class quartile in which they fall and the bar exam pass rates of Coastal students, by quartile, for the last six Florida and Georgia bar exams ("the Bar Pass by Quartile Communication"). The ABA wants a current Coastal student in, for example, the 4th quartile to see the bar exam pass rate of 4th quartile Coastal graduates over the past three years and to infer from that information her likelihood of passing the bar exam. But that inference is misleading because Coastal's current students are not similarly situated to Coastal graduates who took the last six bar exams. Current Coastal students have materially better entering qualifications than students who graduated in prior years and are statistically more likely to pass the bar exam.

For example, for the past four bar exams, Coastal's 3rd quartile students had an average LSAT of 144.4 and Coastal's 4th quartile students had an average LSAT of 142.0. Today, Coastal does not accept students with an LSAT below 145. Because current Coastal students in the 3rd and 4th quartiles have higher LSAT scores than Coastal students in those quartiles in the past, current students in those quartiles have a higher expected bar exam pass rate than past students. The ABA's decision thus forces Coastal to communicate to its students misleading information that the law school would not communicate (and could not be forced to communicate) but for the ABA's flawed decision that fails to comport with due process.

3

Because Coastal must make a Bar Pass by Quartile Communication on July 2, 2018, a TRO is requested before that date.

*Third*, the ABA decision calls for a fact finder to visit Coastal and review and report to the ABA on various matters, including some matters not relevant to the standards with which the ABA found Coastal to be out of compliance. The ABA directed the fact finder to investigate "[t]he rate of default on loans taken by the Law School's graduates to finance their program of legal education and the employment status of the graduates of the Law School" and "[t]he finances of the Law School, particularly as they relate to the stated tuition and fees for 2016-17, the current and succeeding years, the amount of tuition discount, and the range of net tuition paid by class quartile." Conclusion (4). Those matters, however, are irrelevant to Coastal's supposed noncompliance with the accreditation standards at issue in the April 27, 2018 decision.

Because Coastal has a substantial likelihood of success on the merits and satisfies all of the preliminary injunction standards, this Court should restrain and enjoin the ABA from enforcing or applying the April 27, 2018 decision against Coastal and the three specific remedial actions that inflict irreparable injury on Coastal: the Public Notice, which is a product of the ABA's due process violations; the misleading Bar Pass by Quartile Communication; and the fact finder's inquiry into irrelevant matters.

## BACKGROUND

### A. Florida Coastal School of Law

Coastal was founded in 1996 and fully approved by the ABA in 2002. As noted, the first-time pass rate (*i.e.*, the pass rate for persons taking the bar exam for the first time) for Coastal students on the February 2018 Florida bar examination was 62.1%, fourth best in the State out of eleven law schools. That pass rate was 4.2 percentage points above the state average of 57.9%. The pass rate for Coastal students on the National Multistate Professional

Responsibility Examination given in November 2017 was 97%. Coastal raised its admissions standards in Fall 2016. In Spring 2018, the entering credentials of Coastal students were higher than or equal to 52 other ABA-approved law schools. *See* DeVito Decl. ¶¶ 2-5.

The large majority of Coastal students pass a bar exam after graduation. For example, as of November 2017, 90.06% of the class of 2011 had passed a bar exam; 94.64% of the class of 2012 had done so; and 89.30% of the class of 2013 had done so. *See id.* ¶ 8. Coastal complies with Standard 316, the ABA's accreditation standard governing bar passage. *See id.*

### B. The ABA and its Accreditation Standards

Coastal is accredited by the ABA. The U.S. Department of Education ("DOE") recognizes two components of the ABA, the Council of the Section of Legal Education and Admissions to the Bar ("Council") and the Accreditation Committee of the Section of Legal Education and Admissions to the Bar ("Committee"), as the accrediting agencies for law schools. The Council and Committee are collectively referred to herein as the "ABA."

The ABA accredits pursuant to its Standards and Rules of Procedure for Approval of Law Schools ("Standards") (Ex. 4). The most relevant standards in this case are:

- Standard 301(a): "A law school shall maintain a rigorous program of legal education that prepares its students, upon graduation, for admission to the bar and for effective, ethical, and responsible participation as members of the legal profession."

- Standard 309(b): "A law school shall provide academic support designed to afford students a reasonable opportunity to complete the program of legal education, graduate, and become members of the legal profession."

- Standard 501(b): "A law school shall only admit applicants who appear capable of satisfactorily completing its program of legal education and being admitted to the bar."

- Interpretation 501-1: "Among the factors to consider in assessing compliance with this Standard are the academic and admission test credentials of the law school's entering students, the academic attrition rate of the law school's students, the bar passage rate of its graduates, and the effectiveness of the law school's academic support program."

In addition, under its Rule 16(a), the ABA may impose sanctions on a law school for "[s]ubstantial or persistent noncompliance with one or more Standards." Ex. 4.

The ABA's decision of April 27, 2018, concluded that Coastal is not in compliance with Standards 301(a), 309(b), and 501(b) and Interpretation 501-1, and that "the issues of non-compliance with" those standards "are substantial and have been persistent." Conclusions (1) & (3). The ABA imposed immediate and specific remedial actions on Coastal, including compelled speech requirements. *See* Conclusion (4).

### C. The ABA's Duty Under Federal Law to Provide Due Process

Several sources of law require the ABA to provide due process to the law schools it accredits. First, the Higher Education Act ("HEA") and DOE regulations expressly require "due process." 20 U.S.C. § 1099b(a)(6); 34 C.F.R. § 602.25. Those provisions require an accrediting agency, among other things, to specify in writing any deficiencies identified at the school; to consider the school's written response regarding any deficiencies before any adverse action is taken; and to describe the basis for any adverse accrediting action. *Id.*; *see also* 34 C.F.R. § 602.18 (requiring an accrediting agency to "consistently apply and enforce" its standards).

Second, accrediting agencies have a duty under federal common law provide due process. *See, e.g., Edward Waters Coll., Inc. v. S. Ass'n of Colls. & Schs., Inc.*, No. 3:05-cv-180, 2005 WL 6218035 (M.D. Fla. Mar. 11, 2005) (Corrigan, J.) (granting preliminary injunction against accreditor based on common law due process); *Fla. Coll. of Bus. v. Accrediting Council for Indep. Colls. & Schs.*, 954 F. Supp. 256 (S.D. Fla. 1996) (same); *see also Hiwassee Coll., Inc. v.*

*S. Ass'n of Colls. & Schs.*, 531 F.3d 1333, 1335 (11th Cir. 2008) (adjudicating such a claim); *Prof'l Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. & Colls.*, 781 F.3d 161, 169-70 (4th Cir. 2015) (citing cases from six other circuits recognizing such claims). The "contours" of the federal common law right of due process are "informed by the Secretary's definition of due process as contained in the Secretary's regulations." *Edward Waters*, 2005 WL 6218035, at *5 n.7 (citing 34 C.F.R. § 602.25); *accord Bristol Univ. v. Accrediting Council for Indep. Colls. & Schs.*, 691 F. App'x 737, 741 (4th Cir. 2017).

In adjudicating federal common law due process claims, courts apply principles of administrative law. *See Prof'l Massage*, 781 F.3d at 170; *Chi. Sch. of Automatic Transmissions, Inc. v. Accreditation All. of Career Schs. & Colls.*, 44 F.3d 447, 450 (7th Cir. 1994). Judicial review of such claims is "similar to the inquiry under the Administrative Procedure Act ('APA')." *Fine Mortuary Coll., LLC v. Am. Bd. of Funeral Serv. Ed., Inc.*, 473 F. Supp. 2d 153, 157 (D. Mass. 2006). Thus, courts consider whether the accreditor's decision is arbitrary, capricious, unreasonable, an abuse of discretion, not based on substantial evidence, or otherwise not in accordance with law or reached without observance of procedure required by law (collectively "arbitrary and capricious"). *See Prof'l Massage*, 781 F.3d at 171-72; *Hiwassee Coll.*, 531 F.3d at 1335 & n.4; *Chicago Sch.*, 44 F.3d at 449; *Edward Waters*, 2005 WL 6218035, at *5, *13 n.17; *Fla. Coll. of Bus.*, 954 F. Supp. at 258.

The APA requires an agency to provide a "reasoned explanation" for its actions. *Judulang v. Holder*, 565 U.S. 42, 53 (2011); *see Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 920 (D.C. Cir. 2017) (APA "prohibits arbitrary and capricious actions by federal agencies and mandates that they give reasoned explanation for the actions that they do take"). And so it is with accrediting agencies. Due process requires that an accreditor's decision "be

provided in writing and supported by the evidence." *Prof'l Massage*, 781 F.3d at 179. Both kinds of agencies must give a reasoned explanation for any departure from agency precedent. *See Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003) (Roberts, J.). "An agency's failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decision making." *Id.* at 1125 (quotation marks omitted).

To satisfy due process, it is not enough for an accrediting agency to have fair rules of procedure. The outcome of the accreditor's procedures must comport with due process by producing a decision that is not arbitrary and capricious. *See Fla. Coll. of Bus.*, 954 F. Supp. at 258 (accreditor's "internal rules … provided a fair and impartial procedure" but its decision still could not be "arbitrary, capricious, … or not supported by substantial evidence").

Like an administrative agency, an accrediting agency receives "a measure of deference" from a reviewing court but not "total deference." *Prof'l Massage*, 781 F.3d at 171, 169. Indeed, "judicial oversight of the accreditation process surely has its place," *id.* at 172, because accrediting agencies, "like all other bureaucratic entities, can run off the rails," *id.* at 169.

### D. The ABA's Decision of April 27, 2018 Concludes That Coastal Is Not in Compliance With the Standards and Imposes Specific Remedial Actions.

At issue is a decision of the Committee concluding—without reasoned explanation or factual findings supporting its conclusions—that Coastal is not in compliance with Standard 301(a) concerning a rigorous program of education; Standard 309(b) concerning academic support; and Standard 501(b) and Interpretation 501-1 concerning admission of capable applicants. *See* Conclusion (1). The ABA also concluded, with no explanation whatsoever, that the "the issues of non-compliance" with those standards "are substantial and have been persistent." Conclusion (3); *cf.* ABA Rule 16(a) (Ex. 4). As explained below, the ABA violated due process on its way to reaching those conclusions. *See infra* at 10-19.

Based on its conclusion of noncompliance, the ABA directed Coastal to take "specific remedial actions." Conclusion (4). First, the ABA directed Coastal to "provide to all admitted students and publish on its website" a "Public Notice of Specific Remedial Action." Conclusion (4-d); *see* Ex. 3 (copy of Public Notice). The ABA supplied the two-page Public Notice it required Coastal to publish and provide to students. The ABA directed Coastal to disseminate the Public Notice within five business days of April 27, 2018, and Coastal did so.

Second, the ABA directed Coastal to communicate to each student at the law school "within 30 days of the completion of the assignment and distribution of semester grades," the Bar Pass by Quartile Communication: "(a) the Florida and Georgia first-time bar examination passage rates, by class quartiles, for Law School graduates sitting for the Florida and Georgia bar examinations over the six administrations preceding the semester; [and] (b) the class quartile in which the student then falls." Conclusion (4-e).

Third, the ABA ordered the appointment of a fact finder to visit Coastal and review and report to ABA on "the admissions data and admissions methodology provided by the Law School, as well as the overall rigor of its program of legal education." Conclusion (4-b). The ABA ordered the fact finder to "pay particular attention" to several matters, such as the bar exam results of Coastal graduates, the law school's admissions policies, its attrition rates for Spring and Summer 2018, and the adequacy of its academic support program. *Id.* The ABA also ordered the fact finder to investigate matters unrelated and irrelevant to the standards with which Coastal was found not to be in compliance, *i.e.*, Standards 301(a), 309(b), and 501(b) and Interpretation 501-1. Specifically, the ABA ordered the fact finder to investigate "[t]he rate of default on loans taken by the Law School's graduates to finance their program of legal education and the employment status of the graduates of the Law School" and "[t]he finances of the Law

School, particularly as they relate to the stated tuition and fees for 2016-17, the current and succeeding years, the amount of tuition discount, and the range of net tuition paid by class quartile." Conclusions (4-b-v & 4-b-vi).

The ABA ended its decision with a Notice stating that the ABA will remove Coastal from its list of approved law schools by September 28, 2019, or before that date, if Coastal does not demonstrate compliance with the Standards. *See* Ex. 2 at pg. 8. Coastal has appealed the Committee's decision to the Council, but the appeal does not stay the decision or the Public Notice, Bar Pass by Quartile Communication, or fact finder inquiry. *See* DeVito Decl. ¶ 19.[3]

## TRO AND PRELIMINARY INJUNCTION STANDARDS

"The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *BellSouth Advert. & Publ'g Corp. v. Real Color Pages, Inc.*, 792 F. Supp. 775, 780 (M.D. Fla. 1991). "A preliminary injunction is an equitable remedy available in the sound discretion of the court." *Fla. Coll. of Bus.*, 954 F. Supp. at 259 (granting TRO and preliminary injunction against accreditor). The Eleventh Circuit has set forth the applicable standards for granting relief:

> A TRO or preliminary injunction is appropriate where the movant demonstrates that:
> (a) there is a substantial likelihood of success on the merits;
> (b) the TRO or preliminary injunction is necessary to prevent irreparable injury;
> (c) the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant; and
> (d) the TRO or preliminary injunction would not be averse to the public interest.

*Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001); *see also*

---

[3] On May 30, 2018, the ABA filed a motion with the U.S. Judicial Panel on Multidistrict Litigation to transfer the instant case to the Western District of North Carolina. Coastal intends to oppose the motion. According to Rule 2.1(d) of the Panel's Rules of Procedure, a motion to transfer "does not affect or suspend orders and pretrial proceedings in any pending federal district court action and does not limit the pretrial jurisdiction of that court."

Local Rule 4.05(b)(4).  As shown below, Coastal's motion meets all four standards.

## ARGUMENT

**I.     The Law School Has a Substantial Likelihood of Success on its Federal Common Law Due Process Claim.**

In the *Edward Waters College* case, Judge Corrigan granted a college a preliminary injunction of an accrediting agency decision in order to maintain the status quo.  *See Edward Waters*, 2005 WL 6218035 (M.D. Fla. Mar. 11, 2005).  Before the preliminary injunction, he granted a TRO.  *See* Order, *Edward Waters*, No. 3:05-cv-00180 (M.D. Fla. Feb. 28, 2005), Dkt. 10.  Judge Corrigan ruled that the college showed a substantial likelihood of success on its due process claim against its accreditor.  *See Edward Waters*, 2005 WL 6218035, at *4-*13.

Judge Corrigan explained that, to satisfy the substantial likelihood of merits success factor, the plaintiff must "articulate a basis for relief that would withstand scrutiny under Fed. R. Civ. P. 12(b)(6) (failure to state a claim)" and "produc[e] evidence sufficient to support the elements of its claim."  *Id.* at *4 (quoting *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004)).  Coastal meets that test.  Coastal can show "a substantial likelihood" that the ABA "did not afford [the law school] due process."  *Id.* at *6.

The ABA's April 27, 2018 decision reflects all of the worst (and due process violating) tendencies of ABA accreditation decisions in recent years:  The decision finds the law school out of compliance with vague ABA Standards that lack objective metrics for determining compliance.  The decision does not provide a reasoned explanation of how the law school is out of compliance with the Standards at issue.  The decision reaches conclusions that are contrary to and not supported by the facts found in the decision.  The decision fails adequately to explain any of its conclusions of noncompliance with the Standards and provides no explanation at all for some of its conclusions.  The decision fails to provide any guidance on what the law school

must do or show to return to compliance with the Standards. The decision imposes specific remedial actions that are wholly unrelated to the Standards at issue and counterproductive to the law school's efforts to return to compliance with the Standards, including requirements to immediately notify both existing students and potential applicants of the ABA's decision. The decision is inconsistent with a contemporaneous ABA decision on another law school and fails even to address the other decision let alone attempt to reconcile the two decisions.

### A. The ABA's Conclusion That Coastal Is Not in Compliance With the Standards Is Arbitrary and Capricious.

An accrediting agency, just like an administrative agency, must provide a reasoned explanation for its decisions, which otherwise are arbitrary and capricious. *See Judulang*, 565 U.S. at 53; *Am. Wild Horse Pres. Campaign*, 873 F.3d at 920. Here, however, the ABA offered neither explanations nor reasons for its decision. The ABA merely stated that "the Committee concludes that the Law School's efforts and programmatic changes made have not sufficiently improved its outcomes. ... See Findings of Fact (5)-(15)." Conclusion (1) (brackets omitted).

This statement falls short of a reasoned explanation, for several reasons. First, the statement that Coastal's changes have "improved its outcomes" but "not sufficiently" is not explained. The ABA did not explain (a) what outcomes it was referring to; (b) why Coastal's outcomes, although improved, were not "sufficiently" improved; or (c) what Coastal must show to have the improvement in its outcomes deemed material. The ABA has a duty to be specific about its reasons for making an adverse accreditation decision. *See* 20 U.S.C. § 1099b(a)(6) (accrediting agency must "specif[y]" in writing any deficiencies); 34 C.F.R. § 602.25(c) (same).

Second, the ABA's focus on insufficiently improved outcomes makes its failure to even consider the materially improved outcomes in the latest bar-passage data well-nigh inexplicable (and certainly unexplained). Coastal's most important "outcome" arguably is its graduates' bar

exam passage rate. The ABA noted that Coastal graduates' first-time pass rate for the July 2017 Florida bar was 49%, higher than the rate for the February 2017 bar (20%) and slightly lower than the rate for the July 2016 bar (52%). Finding (8). But the ABA ignored the results of the most recent bar exam, the February 2018 bar, in which Coastal graduates had a 62.1% first-time pass rate, fourth best in the State out of eleven law schools and above the state average and such other schools as the University of Florida (31.8%), the University of Miami (56%), and Stetson University (56%). Florida Coastal provided this data to the ABA on April 16, 2018, the same day it was publicly released by the Florida Board of Bar Examiners. *See* DeVito Decl. ¶ 6. That was eleven days before the ABA issued its April 27, 2018 decision. Yet the ABA completely ignored the data, even though it knew the data was coming. *See* Finding (10) (noting that the results of the February 2018 bar "will be available on April 16"). In short, the ABA's conclusion that Coastal did not "sufficiently improve[ ] its outcomes" failed to account for this crucial data that it had in its possession but chose to ignore.

The failure to consider the most recent data here parallels the failure that caused the court to grant preliminary relief in the *Florida College of Business* case. There, the accreditor, ACICS, took adverse action in part because the school submitted a report showing that less than 50% of its students had a high school diploma. But ACICS disregarded a second report from the school showing that, in fact, more than 50% of students had a diploma. The court saw "no evidence in the record to support ACICS' decision to reject the second report" and so held that ACICS's decision "was not supported by substantial evidence." 954 F. Supp. at 259. The court found that the school had "a substantial likelihood of success on the merits" and issued a preliminary injunction. *Id.* at 260. So too here. The ABA's failure to account for the February 2018 Florida bar exam results renders its decision arbitrary and capricious.

Third, the ABA offers ipse dixit, rather than reasoned explanation, in stating that Coastal

is not in compliance with Standards 301(a), 309(b), and 501(b) and Interpretation 501-1 in that

Coastal has not shown

> that it is not admitting applicants who do not appear capable of satisfactorily
> completing its program of legal education and being admitted to the bar; that it
> maintains a rigorous program of legal education that prepares its students, upon
> graduation, for admission to the bar; and that it is providing academic support
> designed to afford students a reasonable opportunity to complete the program of
> legal education, graduate, and become members of the legal profession.

Conclusion (1). That statement merely repeats the words Standards 301(a), 309(b), and 501(b).

Incanting the words of those standards does not explain why Coastal is supposedly out of

compliance with them—especially because Standards 301(a), 309(b), and 501(b) are vague and

lack objective metrics for assessing compliance. The current Chair of the Council has been

quoted as saying that the ABA's Standards are "fuzzy and hard to enforce." DeVito Decl. ¶ 22

& Ex. 5. The HEA and DOE regulations, however, require "clear standards" of accreditation.

20 U.S.C. § 1099b(a)(6); 34 C.F.R. § 602.25(a).

Fourth, the ABA attempted to support its conclusions by waving its hands in the direction

of its findings: "See Findings of Fact (5)-(15)." Conclusion (1). But the ABA failed to explain

how the cited findings actually support its conclusions. It did not explain how the findings

constitute non-compliance with Standards 301(a), 309(b), and 501(b). Furthermore, as shown

next, the ABA's findings do not, in fact, support its conclusion of noncompliance.

### B.    The ABA's Findings Do Not Show Coastal to Be Out of Compliance With the Standards.

The fact that the ABA failed to provide a reasoned explanation for its conclusions is

sufficient to show that the ABA violated due process. But the ABA's factual findings, far from

supporting the ABA's conclusions, actually undermine them. The ABA's findings concerned

four matters: Bar exam results, LSAT scores, academic support, and academic attrition.

1. *Bar Exam Results* — The ABA's findings concerning the bar exam results of Coastal students do not show that Coastal is out of compliance with the Standards. The ABA stated that the Florida bar exam results for July 2017 "continues the negative trend in the Law School's bar exam passage outcomes." Finding (9). But the ABA ignored the February 2018 bar exam results altogether. Those improved bar exam results were no fluke; they are directly attributable to structural changes made by the law school and thus can be expected to continue. Indeed, the ABA acknowledged the "recent changes to the admissions policy of the Law School and its academic support programs," Finding (8), "changes in the mandatory bar preparatory courses," Finding (9), "a spring 2018 class with increased incoming credentials of a 150 median LSAT score," Finding (13), and "the determination to raise the entering credentials," Finding (16).

Because the ABA improperly ignored the February 2018 bar exam results, the ABA was in no position (and flat wrong) to say that Coastal's changes "have not been in place for a sufficient time to provide evidence that they have been or will be effective in improving the Law School's outcomes." Finding (8). The February 2018 results demonstrate that the changes have already improved outcomes.

Moreover, despite the ABA's concerns about vague and undefined outcomes, Coastal fully complies with Standard 316, the ABA standard specifically governing bar pass. The ABA admitted that "the Law School satisfied Standard 316 for each of the years from 2012 to 2015 based on the Law School's first-time pass rate." Finding (9); *see* Standard 316 (Ex. 4). The ABA's specific finding about Coastal's compliance with Standard 316 affirmatively undermines its conclusion that Coastal has fallen short of some vague standard with respect to outcomes.

2. *LSAT Scores* — The ABA's findings concerning LSAT scores further undermine the ABA's conclusion of noncompliance with the Standards. Coastal, as the ABA acknowledged,

made "the determination to raise the entering credentials" of its students. Finding (16). For Spring 2018, Coastal admitted and matriculated students with a median (50th percentile) LSAT score of 150. *Id.* The 25th percentile score was 147, which was "an improvement over 145 for fall 2017 and 141 for 2016." *Id.* No new students in Spring 2018 "had a score below 145." *Id.* In Fall 2017, the 25th percentile score was 145, "an improvement over 141 for 2016." Finding (4). Citing Findings (4) and (16), the ABA concluded that Coastal is in compliance with Standard 501(a) concerning sound admissions policies and practices, *see* Conclusion (2).

3. *Academic Support* — Findings of Fact (5)-(7) concern Coastal's academic support program in Fall 2017. The three paragraphs making up those findings were taken from Coastal's own written submissions to the ABA and contain nothing negative about academic support at Coastal. The findings undermine the ABA's conclusions of noncompliance with the Standards

4. *Academic Attrition* — The ABA's findings concerning attrition at Coastal in Fall 2017 also undermine its conclusions. *See* Findings (11)-(15). Of the 66 students who matriculated in Fall 2017, 20 were academically dismissed because they fell below the 2.0 law school GPA required to remain in good standing, which is a 30% attrition rate. Of those 20 students, at least five either ceased attending on their own or had personal issues that directly resulted in their being counted as academically dismissed. *See* Finding (11).

The ABA acknowledged the numerous efforts being made by Coastal to help students struggling academically and reduce attrition. *See* Finding (12):

> [S]tudents are being monitored more closely and provided additional help with their writing. Those on probation (2.0 to 2.29 GPA) must meet with their academic program director, consult materials on the D2L (Desire to Learn) platform, and create a study plan. … Students on probation or alert cannot participate in certain activities like moot court or various organizations."

The ABA noted that Coastal "has matriculated a spring 2018 class with increased

credentials of a 150 median LSAT score"—reflecting the ABA's apparent view that students with higher LSAT scores are less likely to attrit. Finding (13).

Finding (14) described Coastal's efforts to determine if objective factors could be used to identify students at high risk of academic dismissal. Next, Finding (15) stated that Coastal "used formative assessments for fall 2017 1Ls in an attempt to identify students struggling academically. Formative assessments are given in every class and each faculty member must require a midterm worth at least 20 percent of the grade. The 1Ls also had a midterm review. Students struggling are identified for the Academic Programs Directors." Finding (15).

Given Coastal's multi-faceted effort to deal with academic attrition as described in Findings (12)-(15), it is hard to see how attrition could have been a reason to find the law school out of compliance with the Standards. If attrition were among the ABA's reasons, one will search the decision in vain for an explanation in that regard.

From 2012 to 2017, ten other law schools had academic attrition rates comparable to Coastal's rate in that period. *See* DeVito Decl. ¶ 20. All ten were at or above 20% attrition each of those six years. Yet only half of them, like Coastal, have been cited by the ABA under Standard 501. On this issue, the ABA has not "consistently appl[ied] and enforce[d] [its] standards." 34 C.F.R. § 602.18.

## C. The ABA's "Substantial and Persistent" Conclusion Is Wholly Unexplained.

ABA Rule 16(a) allows the ABA to impose sanctions on a law school for "[s]ubstantial or persistent noncompliance with one or more of the Standards." Ex. 4. In its April 27, 2018 decision, the ABA "conclude[d] … in accordance with Rule 16(a)" that "the issues of non-compliance with Standards 301(a), 309(b), and 501(b) and Interpretation 501-1 are substantial and have been persistent." Conclusion (3). The ABA followed that conclusion with these

sentences: "The Law School's plans for bringing itself into compliance with the Standards have not been demonstrated to be effective or reliable. Further, the Law School has not shown sufficient cause why it should not be directed to take specific remedial action." *Id.*

But the ABA did not cite any facts supporting its view that the "issues of noncompliance ... are substantial and have been persistent" or otherwise explain the conclusion. *Id.* Nor did the ABA explain what definitions or tests, if any, it uses for substantiality and persistence. And, notably, Rule 16(a) requires substantial or persistent *noncompliance* with the Standards, not just substantial or persistent "issues" (i.e., questions) of noncompliance. It is not enough for "issues" to be substantial or persistent; actual noncompliance must be substantial or persistent. On its face, the ABA's conclusion here does not meet the requirements of Rule 16(a).

### D.  The ABA's Decision on Coastal Is Inconsistent With Its Contemporaneous Decision on Another Law School, and the ABA Did Not Even Attempt to Explain the Inconsistency.

On April 18, 2018, the ABA issued a decision on Cooley law school. *See* Ex. 6. In that decision, made only nine days before the Coastal decision, the ABA concluded that Cooley is in compliance with Standard 501(b) and Interpretation 501-1. *Id.* at 3. In September 2017, the ABA had concluded that Cooley was out of compliance. *Id.* at 1. In its April 18, 2018 decision, the ABA concluded that Cooley had returned to compliance because Cooley had raised its admissions standards just a few months earlier, in January 2018. *Id.* Explaining its decision in a short statement the ABA publicly released on or about April 25, 2018, the ABA cited the "concrete steps taken by [Cooley] with respect to its admissions policy and practices." Ex. 7.

The ABA's decision on Cooley is blatantly inconsistent with its decision on Coastal. *See* 34 C.F.R. § 602.18 (accreditor "must consistently apply and enforce [its] standards"); *Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Tech. Schs.*, 817 F.2d 1310, 1314 (8th Cir. 1987) (accreditor must treat "similarly situated" schools "similarly"). Coastal, like Cooley, has raised its

admissions standards. Coastal made some of the changes to its admissions policy and practices in Fall 2016, before Cooley. Yet while Cooley was lauded for its concrete steps the ABA dismissed Coastal's changes as having "not been in place for a sufficient time" to demonstrate compliance with the Standards and as having "not sufficiently improved [Coastal's] outcomes." Finding (8) & Conclusion (1). Coastal's changes, however, were adopted *before* Cooley's changes and unquestionably *have improved* Coastal's outcomes—unlike Cooley's changes, which were too new to have had any effect on outcomes as of April 2018. Like Cooley, Coastal has taken "concrete steps" with respect to its admissions policy and practices. But the ABA concluded that Cooley is in compliance and Coastal is out of compliance. The conflict between the two decisions is stark. Coastal's changes clearly satisfy the "concrete steps" test applied by the ABA in Cooley's case, and Cooley's changes clearly do not satisfy the sufficient-time-and-improvement test applied by the ABA in Coastal's case.

The ABA made no attempt to reconcile its decisions on Cooley and Coastal, in violation of both its duty to provide a reasoned explanation for departures from precedent and the DOE regulations. *See* 34 C.F.R. § 602.18(b) (accreditor must have "effective controls against the inconsistent application of [its] standards"). Although the ABA's decisions on Cooley and Coastal came within days of each other, the Coastal decision does not cite the Cooley decision or vice versa. Indeed, the ABA's decision on Coastal is notable for its failure to cite any precedent whatsoever. Of course, one difference between Coastal and Cooley is that the former is a proprietary school and the latter is not. But Coastal's for-profit status is not a lawful basis for the ABA to take adverse action against the law school.

## II. The ABA's Decision Inflicts Irreparable Injuries on the Law School.

The ABA's decision inflicts irreparable injuries on Coastal. Three of the specific remedial actions imposed by the ABA do so: the compelled Public Notice of the ABA's due

process-violating decision; the misleading compelled Bar Pass By Quartile Communication; and the fact finder's inquiry into irrelevant matters. "An injury is irreparable if it cannot be undone through monetary remedies. Even when a later money judgment might undo an alleged injury, the alleged injury is irreparable if damages would be difficult or impossible to calculate." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (quotations marks and citation omitted).

### A. The Public Notice Harms Coastal's Ability to Attract and Retain Students by Forcing Coastal to Publicize the ABA's Due Process-Violating Decision.

The ABA ordered Coastal to publish on its website and provide to all admitted students a Public Notice, in a form provided by the ABA, announcing that the ABA has found the law school to be out of compliance with Standards 301(a), 309(b), and 501(b) and Interpretation 501-1. *See* Conclusion (4-d); Ex. 3 (copy of Public Notice).

The Public Notice inflicts irreparable injury on Coastal. It directly undermines Coastal's ongoing efforts to attract better-credentialed students and risks creating a vicious cycle where the ABA's "remedial" actions make it harder to attract excellent candidates, which in turn hurts "outcomes" in ways that justify further adverse action by the ABA. Every day the Public Notice is on Coastal's website it harms Coastal's ability to attract and retain higher credentialed students. It deters prospective students from applying and matriculating and it encourages current students to transfer or end their law studies. In so doing, the Public Notice makes it more difficult for Coastal to return to compliance with the ABA's standards. *See* DeVito Decl. ¶ 11.

The Public Notice is a compelled speech requirement and implicates the same concerns, especially as to irreparable injury, as those underlying the First Amendment's general prohibition against the government's compulsion of speech from private parties. The Public Notice forces Coastal to speak against itself and to communicate the ABA's message to Coastal's current and prospective students, alumni, faculty, the legal community, and the public. *Cf. S.D. v. St. Johns*

*Cty. Sch. Dist.*, 632 F. Supp. 2d 1085, 1096 (M.D. Fla. 2009) ("[E]ven the briefest infringement

of a First Amendment right constitutes irreparable injury.") (citing *Elrod v. Burns,* 427 U.S. 347,

373-74 (1976)). And the ABA's message that Coastal is being forced to disseminate is flawed

and misleading because it is the product of the ABA's due process violations.

### B. The Bar Pass by Quartile Communication Requires Coastal to Provide Misleading Information to its Students.

The ABA directed Coastal to advise each law student every semester of the bar exam

pass rates of Coastal students by class quartiles over the last six Florida and George bar

examinations, and the quartile in which the student falls. *See* Conclusion (4-e). Coastal must so

advise its students within 30 days of the completion of the distribution of semester grades. *Id*.

Coastal must distribute this information by July 2, 2018. *See* DeVito Decl. ¶ 12.

The Bar Pass by Quartile Communication requires Coastal to provide misleading

information to its current students. The ABA has directed Coastal to tell its current students

what class quartile they are in, and how former students who were in that same quartile have

performed on the last six bar exams. The ABA's purpose is to lead current students to believe

that their bar exam performance will be similar those of former students in the same quartile.

But what the ABA is forcing Coastal to say is misleading because current students are not

similarly situated to prior students: current students have higher entering qualifications than

former students. For example, for the prior four bar exams, Coastal's 3rd quartile students had

an average LSAT of 144.4, and its 4th quartile students had an average LSAT of 142.0. Today,

Coastal does not accept students with an LSAT below 145. Thus, current Coastal students in the

3rd and 4th quartiles have higher LSAT scores than Coastal students in those quartiles in the

past, and thus current students in those quartiles will have a higher expected bar exam pass rate

than past students. *See* DeVito Decl. ¶ 13.

The ABA is forcing Coastal to communicate to its students misleading information that Coastal would not, and could not be forced to, communicate but for the ABA's flawed decision. Forcing Coastal to do so is out of step with DOE's regulations prohibiting misrepresentations to students. *See* 34 C.F.R. §§ 668.71-668.74; DeVito Decl. ¶ 14.

By forcing Coastal to provide its current students with misleading quartile comparison information, the ABA inflicts irreparable injury on both students and Coastal. A current Coastal student has a predicted first-time bar pass rate that is much higher than the corresponding pass rate of a former Coastal student in the same quartile. That is so because the most recent entering classes matriculated under dramatically increased admissions standards. Therefore, if a current student is told that her current quartile is comparable for predicting law school success and first-time bar pass to former students in the same quartile, the current student will believe she is a weak student who is unlikely to succeed in law school or doomed to perform poorly on the bar exam, even though based on her LSAT and GPA she is a stronger student with a higher predicted law school success and first-time bar pass rate. *See* DeVito Decl. ¶ 15.

This apples-to-oranges comparison of former and current students required by the ABA will undeniably harm the current student because she will now believe she has a much lower predicted chance of succeeding in law school and passing the bar exam the first time than she actually does—which can cause other negative repercussions. She will be given a false and negative impression of her actual academic ability and, as a result of believing she is a weak student, she may underperform in law school. Similarly, she will be given a false and negative impression of her ability to pass the bar and as a result she may actually underperform on the bar exam. Because the student presumes she will not pass the bar the first time, her studies suffer, which actually decreases her chances of passing the bar the first time. As a consequence, she

may drop out of law school because she has been falsely told her chance of success is low. *See* DeVito Decl. ¶ 16.

Alternatively, based on this misleading information, instead of blaming herself, the current student may blame the law school for her predicted low performance, which may lead her either to transfer or to remain at the law school less engaged and more distrustful. Either way, this harms the law school by depriving it of stronger engaged students who are likely to succeed and pass the bar examination the first time. It also harms the other students in the school who are deprived of the benefit of having stronger engaged classmates. In addition, it potentially harms the student who transfers, because Coastal's data shows that Coastal students who transfer do worse on the bar exam than if they stayed at Coastal. Students who transfer also worsen Coastal's attrition rates, which the ABA could seize upon to take further adverse actions. *See* DeVito Decl. ¶ 17.

### C. Violating Its Own Rules, the ABA Directed the Fact Finder to Investigate Financial Matters That Are Not Relevant to the ABA Standards At Issue.

The ABA is sending a fact finder to visit Coastal and report back on its admissions data and methodology and the rigor of its legal education program. *See* Conclusion (4-b). Although that assignment is not objectionable in light of the issues before the ABA, the ABA ordered the fact finder to investigate two irrelevant financial matters: "The rate of default on loans taken by the Law School's graduates to finance their program of legal education and the employment status of the graduates of the Law School," *id.* (4-b-v); and "[t]he finances of the Law School, particularly as they relate to the stated tuition and fees for 2016-17, the current and succeeding years, the amount of tuition discount, and the range of net tuition paid by class quartile," *id.* (4-b-vi). The fact finder is scheduled to visit the law school in Fall 2018. *See* DeVito Decl. ¶ 18.

The ABA's Rule 12 provides that when the ABA appoints a fact finder, the ABA "must

find the law school in compliance or not in compliance with the Standards for which information was requested or gathered, absent clearly articulated special circumstances." Rule 12(b). Here, the ABA stated that it would use the fact finder's report to evaluate Coastal's "compliance with Standards 301(a), 309(b), and 501(b) and Interpretation 501-1." Conclusion (5). The financial matters in Conclusions (4-b-v) and (4-b-vi), however, are not relevant to those Standards. Those financial matters might be relevant to Standard 202 (Resources for Program) or Standard 507 (Student Loan Programs), *see* Ex. 4, but those Standards were not at issue in the ABA's April 27, 2018 decision, and therefore the ABA did not find Coastal "in compliance or not in compliance with th[ose] Standards." Rule 12(b). Thus, assigning the fact finder to investigate the financial matters is not only arbitrary and capricious but contrary to the ABA's own Rule 12.

## III. The Law School Will Suffer Irreparable Injuries While the ABA Will Not Be Harmed by a TRO and Preliminary Injunction.

Because the first and second injunction factors support Coastal's request for relief, it is no surprise that the third and fourth factors do so as well. As to the third factor, the "threatened injury [to the plaintiff] outweighs the harm that the TRO or preliminary injunction would cause to the non-movant." *Parker*, 275 F.3d at 1035. Coastal will suffer the irreparable injuries described above while granting injunctive relief would not harm the ABA in the least.

Here, as in *Edward Waters*, an accreditation due process case in which Judge Corrigan granted a preliminary injunction, "[t]he preliminary injunction would simply maintain the status quo until the case can go to trial." *Edward Waters*, 2005 WL 6218035, at *4. Therefore, Coastal "has met its burden of showing that 'the threatened injury to plaintiff outweighs whatever damage the proposed injunction may cause the opposing party.'" *Id.* (quoting *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004) (brackets omitted); *see also BellSouth Advert.*, 792 F. Supp. at 780 ("The chief function of a preliminary injunction is to preserve the

status quo until the merits of the controversy can be fully and fairly adjudicated.").

## IV.     A TRO and Preliminary Injunction Would Be in the Public Interest.

Finally, granting Coastal a "TRO or preliminary injunction would not be averse to the public interest." *Parker*, 275 F.3d at 1035. The public interest "is not served if [an] accrediting agency does not observe a school's due process rights." *W. State Univ. of S. Cal. v. Am. Bar Ass'n*, 301 F. Supp. 2d 1129, 1138 (C.D. Cal. 2004) (granting preliminary injunction). Instead, "the public interest is best served by issuing a preliminary injunction to preserve the status quo." *Id*. Clearly, it is not in the public interest to save from injunction an ABA decision that imposes irreparable injury on a law school in violation of due process.

## CONCLUSION AND REQUESTED RELIEF

For the foregoing reasons, Plaintiffs' motion should be granted, and the Court should:

(1) issue the proposed Temporary Restraining Order submitted herewith; and

(2) grant a preliminary injunction enjoining the ABA from: (a) enforcing and applying its April 27, 2018 decision against Coastal; (b) requiring Coastal to publish on its website, provide to students, or otherwise communicate the Public Notice required by Conclusion (4-d) of the ABA's April 27, 2018 decision; (c) requiring Coastal to communicate to students or otherwise publish the bar pass by quartile and other information required by Conclusion (4-e) of the ABA's April 27, 2018 decision; and (d) directing the fact finder to review, report on, and provide information to the ABA on the matters required by Conclusions (4-b-v) and (4-b-vi) of the ABA's April 27, 2018 decision.

Respectfully submitted,

<u>/s/ Kelly DeGance</u>
Mark G. Alexander
Florida Bar No. 434078
Kelly DeGance
Florida Bar No. 0606022
ALEXANDER DEGANCE BARNETT P.A.
1500 Riverside Avenue
Jacksonville, Florida 32204
(904) 345-3277
mark.alexander@adblegal.com
kelly.degance@adblegal.com

Paul D. Clement*
Viet D. Dinh*
H. Christopher Bartolomucci*
KIRKLAND & ELLIS LLP
655 15th Street, NW
Washington, DC 20005
(202) 879-5000
paul.clement@kirkland.com
viet.dinh@kirkland.com
cbartolomucci@kirkland.com

* Admitted *pro hac vice*

*Counsel for Plaintiffs Florida Coastal School*
*of Law, Inc., and InfiLaw Corporation*

Dated: June 15, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2018, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send notice of this filing to: Kevin E. Hyde (khyde@foley.com), Emily Friend O'Leary (eoleary@foley.com), Foley & Lardner LLP, 1 Independent Drive, Suite 1300, Jacksonville, FL 32202-5017; James A. McKee (jmckee@foley.com), Foley & Lardner LLP, 106 East College Avenue, Suite 900, Tallahassee, FL 32301; Tacy F. Flint (tflint@sidley.com), Steven Horowitz (shorowitz@sidley.com), Anne Rea (area@sidley.com), Sidley Austin LLP, One South Dearborn, Chicago, IL 60603.

/s/ Kelly DeGance
Kelly DeGance